Oh yes, oh yes, oh yes, Honorable Health Court, 5th District, State Domino 8 is now in session, please be seated. Good morning everybody. Our first case on the docket is Kelly v. Kelly, 5-23-0003. Appellant, if you are ready to proceed, you may do so, and please identify yourself for the record. Troy Payne, 34, the appellant for M.E. Kelly. You may please look forward to the closing counts, and I may begin. First thing I'd point out is, so there are, in this matter specifically, you have a situation where you have the same standard review for basically all 11 issues which are produced by the M.E. Kelly, the appellant. That standard review specifically has to do with what the weight of the evidence is. It would either be, as spelled out per my appeal, it's spelled out specifically, it's a situation where it's either against the manifest weight of the evidence, if the opposite conclusion is clearly evident, or if it's a finding that are unreasonable, arbitrary, or not based upon the evidence. Abuse of discretion occurs when no reasonable person would take the view adopted by the trial court. Specifically, as for the arguments that we are making, they are not for de novo. These are not matters of law. These are specifically concerning... Could you slow down, please? I'm sorry. I can't hear you. These are specifically concerning what the trial court's finding of facts would have been. And so, in that situation, we get first... You know, let me just say this. If you're going to use a cell phone while you're making argument, you don't need to make argument, as far as I'm concerned. Okay. The cell phone issue is for time. That's all it was for your honor. Okay. Well, let's include time for you. That's fine. Specifically, as to issue number one, as to the transmutation which was found by the court concerning the 8944 Crawford Lane, our argument was that it was contrary to the manifest weight of the evidence. Specifically, because this is a situation where this is property's title. Never was any situation where it was co-mingled and transmuted. Never was in both joint names. The argument was, specifically, there were some repairs and maintenance that were done. There was a situation where there were some insurance checks that were for insurance on that. Now, pay for some repairs. Specifically, as the court had made that finding that it was transmitted together, was that, and that it had lost its identity, I think is contrary to the weight of the evidence. Specifically, that item, that property, stayed separate the entire time. And so, those... Can you discuss the issue, though, of the contribution from the marital estate to that property? So, the arguments for the contribution were specifically, there was one that there had been a gate that had been produced. There was no testimony concerning the value of that. There also was concerning a door that had been replaced. There was real estate tax bills that were paid with joint tax money. The argument was also, too, that there specifically had been joint money used to pay the homeowner's insurance. And how firm would it have been to prove the tracing of the marital? That would have been specifically, it would have been Mr. Kelly. It would have been, because his argument was specifically, if we had made the finding that it was non-marital, which the court found it was non-marital, then for a contribution for transmutation or contributions back, that would have been on the person who was asking from that estate. So, in that situation, Mr. Kelly, who was asking that specifically, since the property had been found to be Ms. Kelly's non-marital property, that there would be contributions rewarded back to the marital estate for contributions the marital estate had made. The second thing, the next argument was the wedding rings. Fairly small arguments, fairly small portion. He had testified specifically that those were given as gifts before the wedding and that they were not in a situation where they, for the first two, and that testimony was uncontradicted as through the trial court, so we would ask that the court find that that was against the manifest way of the evidence. There's a couple situations with the 401K. So that would be three and that would also be four. One thing specifically then was that the date of evaluation the trial court used. We had a situation where this matter took multiple days in court, but we also had a long break then, specifically from when the court finished the closure of evidence until there was a ruling. Most times, it would be a situation where you would look at the date of the evaluation and the value for the trial. There was not a bifurcated divorce that specifically set this at an earlier date. And by doing that, as spelled out in my brief, that was a substantial portion, I believe it was over $60,000, then of the 401K that was not then taken into account. We also then have the next situation where on number four. Excuse me, but on that particular issue, didn't Tammy want to remain married in order to obtain health insurance? The court specifically asked, and we had advised that there was a situation that until the court made a ruling that she continued to be on health insurance. Now, the court then took the matter under, I think, was under advisement for 15 to 16 months. 19 months. 19 months. I apologize. Is that because she wanted to maintain health insurance? No, specifically, at the close of evidence, there was no further hearings until, frankly, after the ruling. So there wasn't, neither the parties nor the court had advised that it was going to be that substantial period of time until there would be a ruling. What about the issue of forfeiture on this money, the $61,000? As that she had given up her interest in that? In that there's no argument in support of how the trial court abused its discretion. I thought there was. Tammy fails to cite any authority showing that the trial court's decision to adopt James' proposal as that was an abuse of discretion. I think that's specifically on a fact-based situation, since it's abuse of discretion. And we went through specifically the fact why we believe that was not appropriate. So I don't think we weighed that argument. I think we went through specifically why we believe it was closer to the time it should be the proper valuation and that would take into account that additional $60,000. Okay. We believe the court abused its discretion as it awarded the great majority of the 401K specifically to James Kelly. And that's a situation where I understand that to be in just proportions, but this is a situation where that was the majority asset, which was then discounted and then was actually at the trial was even given back a later value. And so we believe the court abused its discretion upon the award of the 401K. Specifically, the next one would be five, which is the gifts. There is a presumption transfer from a parent to a child is a gift. But specifically, we believe that was the instance of manifestation of the evidence because Tammy Kelly at that time, she had no employment, she had no source of income, and the only thing she received was maintenance, which had been reduced down. And so I believe, and through the testimony of Tammy Kelly and also through her mother, that those were loans that were requested to be repaid. The same situation for Brad Yockey. He was not a family member. He was not a parent. And he was the absence of any evidence whatsoever that there was any sort of intent to pay it back. I think there was. Mr. Yockey testified that there was an intent to pay it back, and that specifically, I think one of the quotes in there was, you seem to have itemized everything specifically in your detailed list of what was a loan. And he said, yeah, I'm going to count it. That's what I do. So I think there was an intent that was testified to specifically by Mr. Yockey, but also too by Ms. Kelly. The next loan would be the $10,000 non-marital gift that was basically from Tammy's parents. I believe that was contrary to the evidence in the sense that all transfers from Tammy Kelly's parents, sorry, grandparents, had been specifically to her. So during that time period, the parties had been married, and specifically they could have transferred things into joint ownership. They did not. That applied with the money. That applied with the house. That applied with the vehicle, the Jeep, the Mustang. All those items had been specifically, any time that they were titled or deeded, were specifically solely to Tammy Kelly. Seven, which is the situation concerning the court using its discretion on imputing income to Tammy Kelly. Specifically, she had testified she'd been in a car accident. She had back problems. She had a situation where that affected her ability to work. She also even, which I think was most important on this to show contrary, is even Mr. Kelly had signed an affidavit and signed statements basically to the Social Security concerning her disabilities and her lack of being able to work. Did she continue to work? She did for a short period of time, but specifically one of the things she testified to was based upon the party's financial situation. They were so underwater that she went back to work for a short period of time. She also, too, received during the pendency of the dissolution of marriage case, she received a personal injury award for those back injuries, and that was part of the marital estate that was divided up. But she was denied any disability payments? She was at the time of trial. Right. And next here we have a situation which these, I believe, go together, which is eight and nine. We have 40 acres which was not paid on, which was part that was acquired during the marriage. It was property next to her grandfather's place, which was what she inherited, and specifically the 10 acres that she had inherited were set up as part of the security then for that property. And so in that same situation goes along with paragraph nine. We have $32,400 worth of cash withdrawals during this time period when payments were not being made, and specifically this property went back into foreclosure. Now, Ms. Kelly did file a motion and tried to get the court to specifically to require the parties to sign an agreement to try to stop that foreclosure or specifically to take funds out of the 401K then to specifically try to stop this foreclosure. The court did not order that, but as pointed out by counsel, part of her argument is we did not file a notice of claim of dissipation. We acknowledge that. This was a situation where we had subpoenaed those records and we received the first couple statements that showed some cash withdrawals, but the majority of those cash withdrawals came after our documents for the subpoena. And specifically, as per the record, we did not receive those matters until the middle of trial. In hindsight, it probably would have made more sense to go ahead and file that notice of dissipation at that time, but we would have passed our 60 days and we would have been also due for the trial. Now, obviously, we were within the 60 days of discovering it, but in that situation, I believe the court abused his discretion. And to allow that to happen is you have a situation where you're basically rewarding bad behavior. You have a situation where there's arguments of dissipation. He testified specifically that that money was cash and it was used for other things, but most importantly, it was because he had had a creditor came after him and garnished his account, a non-wage garnishment, and so he purposely took that cash out then so there would not be much of a balance then to pay toward the party's creditors. Counsel, I want to make sure I understood you correctly about something. Are you telling me that you were in the middle of trial when subpoenas came back on the bank accounts? Is that what you're saying? No, I'm saying that before the trial, we had specifically sent subpoenas and we would have only received the documents then up until the time of 2019, I believe, or 20 when those subpoenas were issued. So, in other words, we had sent subpoenas prior, we had obtained those records, and then ultimately the majority of that dissipation was actions that were taken after the return date of our subpoena due to Stigum. So why didn't you file a notice of intent? Pardon? At that time, because there was very few, there was only about three cash withdrawals during that time period. What we should have filed at trial is the argument that at that time we had notice. Our position was since we had found information in the middle of trial that we believed it was something we could address in our closing arguments. And all parties were aware there was notice given because, specifically, we received those documents, once again, on the third day of trial. So there was additional evidence gathered during the middle of trial and the trial continued without further gathering of evidence or information? No follow-up subpoenas or anything? There were no follow-up subpoenas during the trial. And specifically, at that time period, the last bank statements we had were, there was a gap between our subpoena and through the trial date. Remind me, did that property ultimately, was it lost in foreclosure? It was. Lastly, we would have a situation that has to do with the murder of Dunn's. Specifically, that argument, that's against the benefit of the evidence. That would have to do with the fact that, specifically, by his own answers in our audit reports, he gave a lot higher substantial amount for those values. They were also listed as collateral as that loan. And that was contrary to what the testimony was. Lastly, that the court abused his discretion. Tammy Kelly, at that time period, had almost no income, other than she had a little bit of farm income and a hunting lease. And so, based upon that, it was our position in the court, she would have been awarded attorney fees. And unless the court had other questions, that's all I have. Was it an affidavit for fees submitted? It was. Do you remember how much it was for? I may. Actually, I do not. Okay. Thank you. Am I correct that the court found that Ms. Kelly was cohabitating? It did at the time of trial. At the time of trial. There was no finding for cohabitation prior to trial, but found through the court's ruling that at the time of trial, that Ms. Kelly was cohabiting at that time. All right. Another question. All right. Thank you, counsel, for giving time for rebuttal. All right. Thank you. Appellee, you may proceed when you're ready. And please identify yourself for the record when you start. Yes. Attorney Amanda Bradley for the Appellee Cross-Pellant. May it please the court. Counsel, I'm going to argue, or I have argued to you three reasons that you will reverse your remand on three very discreet issues in this case. I'm going to rest on my brief on one of them, which is the overpayment of maintenance once Ms. Kelly began living with her boyfriend in the spring of 2019 and didn't disclose it to the trial. I am going to argue to the court about the dissipation of assets finding and the distribution and the division of the marital estate, namely the debts. When a trial court is asked to enter a judgment of dissolution of marriage, it must divide every part of the marital estate, all the assets, all the debts. Here, this trial court has forgotten to divide some of the debts, and before it even did that, it forgot to categorize some of the debts as marital or non-marital, which is a mandate. Let me interrupt you. In the court order, I believe there are a number of question marks. Is that the debt that you're referring to? Yes. So the court entered question marks as part of the proposed property distribution. Is that correct? Yes, Justice Schuller, it is. Very specifically, one of the question marks is about the student loan debt that Tammy took out to go to nursing school. A question mark doesn't tell anybody if it's marital or non-marital. Here's an abuse of discretion. The trial courts entered a finding that Tammy had wasted money, not dissipated money. She had diminished the marital estate. Diminishment is different than dissipation. Dissipation requires a specific notice. Diminishing or decreasing the value of the marital estate is simply a question on who gets what. Once it is divided into marital versus non-marital. What the trial court specifically found is that she had built a house of cards of debt and then voluntarily quit her job at about the time the marriage broke down and no end refused to work to service all of the debts. It denied maintenance on the basis that she was living with her boyfriend, Mr. Yockey, and had been. It only came to light to the trial court when Mr. Yockey testified that they were cohabiting. They were spending money together. He was paying for her bills. He did her taxes. And she was storing her things at his storage locker. Is the record clear about when that cohabitation began, the actual date? It is not specific as to say April 27th. It is by month. It is in Mr. Yockey's testimony about page 503 where he says April or May before trial. Of what year? I'm sorry. I said 2019. It is 2020.  Tammy had maintained, however, during all of trial, never disclosed that she was not living at the one house that she had possession of. So the trial court found that a house of cards of debt over spending, wasteful spending, had been built. Very specifically, one of them was credit cards, the FNB Omaha credit card. My client was kept in the dark about all the debts during the marriage. Tammy was the one who entered into many of these, discussed them, handled them, to the point where my client didn't know that there were 401K debts until he got control of his paychecks and found these debts that were getting taken out of his paycheck, which are not divided by the trial court, by the way. But he believed that this one credit card had been paid off. Later on, by the time we get to trial, it was written off, but it had grown to $19,000. It was inequitable, and it gets a manifest weight of the evidence, but the trial court found that that debt specifically be divided 50-50 when it found the rest of the marital debts should be divided 33 to my client, 66 to Ms. Kelly. However, with the FNB Omaha debt, it puts my client closer to 40%. Then the trial court did not actually divide one of the debts that existed. There was evidence about that debt as of the time of trial, and that is the 401K loan debt. As of the time of trial, it was about $13,000. My client was paying on it. And yes, by the time the trial court ruled approximately 21 months later, one of the debts was either paid off or nearly so, but that doesn't mean that as of the time of trial, when the marital estate should be divided, that it existed and my client had to pay for it. With the failure to rule on whether something is a marital debt or a non-marital debt, it's probably marital, the student loan, to put two of the debts into my client's category, while they're de minimis, there's no evidence that he was the one who created them, to order him to pay half of another debt, the FNB Omaha debt, and forget to rule on the 401K loan, the court made an error in dividing the marital debts give or take 50-50 when the intention was to divide it one-third, two-thirds. What was your resolution of that issue? How would you resolve that? I would resolve it to make sure that the student loan debt is listed under Ms. Kelly's name, that she is to pay a larger portion of the FNB Omaha debt and to repay a portion of the 401K debt. I would give you the math, but my math skills are terrible and I will make an error if I try and don't grab my phone. So you would have her repay part of the FNB Omaha debt? Yes, I would have her repay my client enough to bring the distribution back to one-third, two-thirds, as well as on the 401K loan debt. With her assuming two-thirds? Yes. Why? Because she was found to have created the debt. She was a wasteful spender. For example, there was a piece of property purchased, approximately 40 acres, that my client didn't know about specifically, and then later on he did. It was lost. I was going to say he was aware of the property. Yes. So he had to be aware of the debt. He was only partially aware of the debt. He was largely kept in the dark. Is there a stick-your-head-in-the-sand defense in marriage? You would think there is if you spend time in divorce court, but no, there shouldn't be. But there was testimony that she hid it from him. She didn't hide the 40 acres from him. No, she did not later on hide the 40 acres from him. Did she hide the student loan debt? Yes. My client believed that they had taken a home equity loan to pay for her nursing school education to go from an R.N. to a B.S.N. and was unaware that she had taken additional loans out to get her R.N., her four-year R.N. degree. Okay. So the only basis for you asking the 66 percent is because your client claims he didn't know. And Ms. Kelly engaged in wasteful spending. Is that an issue in marriage cases, wasteful spending? It is. Statutorily, I believe it's D-2 or D-3 says the increase or the decrease to the marital estate. In Ray Abma says that a party that doesn't contribute to the growth of the marital estate and creates nothing but debt is rightfully ordered to pay the majority of the debt. In Abma, the one spouse had gone to law school and was not a successful lawyer, was not making a good income. The trial court awarded her a portion of the marital home, a portion of the other spouse's pension that she didn't increase but not 50 percent and ordered her to pay all of the debts that she had created to obtain her education because she was the one who had spent them. That sounds a little different to me when you're going to law school as opposed to the parties here before us. She went to nursing school, correct? And she did not finish, correct. Right. Okay, thank you. Can you address the issue of the transmutation of the Crawford property? Absolutely. In 2006 or 2007, Tammy received from her grandparents' estate a piece of property called Crawford Lane. I don't know the exact address, but it's mostly referred to as Crawford Lane. And from 2006 until 2019, the taxes were paid on that property through the marital accounts. Tammy testifies we had only joint accounts. The homeowner's insurance was paid through that account. They rented it out at various points in time, put the money from the rent into their joint accounts. They did maintenance. They put a roof on. They received money for storm damages throughout the many years. And they used joint money throughout it. It is a burden on both of them, whoever wants to claim it. And the trial court found that no one traced the money. The trial court also found that no one traced that it stayed in one, that Tammy didn't trace that it stayed in the one estate, and that is Albrecht. This says who needs to, I'm sorry, it's not Albrecht, but who needs to keep it. But if it stayed in the one estate, namely the non-marital estate, wouldn't it have been your client's obligation and duty to trace any marital funds that were contributed? If it had been found to be in the non-marital estate, yes, it would be incumbent upon him to trace it. But moreover, it is actually a de minimis error because when the court divides an estate, it looks at the three estates of the parties. So at the moment a divorce is filed, there are three estates, the marital estate and the separate estate of each spouse. And when it divides, the trial court looks at what is in the person's separate estate and what is to be divided in the marital estate. So whether or not it's in the marital estate or not is really actually, aside, is not much of an issue because she would have gotten a house that was paid off, about $70,000 worth of value, and had that value outside of the marriage. And then the trial court could have made an order, giving my client a little bit different on the division of the marital estate, so that they each walked away with about 50-50 on the money that was available in their lives. All right, but that doesn't seem to be de minimis to me. I mean, it seems to me that the first step was this property was an inheritance and deemed non-marital statutorily, and then the issue was, was it transmuted? To me, transmuted requires that it loses its identity. Did this property ever become commingled with your client? Yes, he was on the insurance, he was on the taxes, he paid the bills, he paid the... How about the deed? He was never on the deed. However, our Supreme Court has said that it doesn't matter whose name is on the deed to a home. Could those be deemed simply contributions from the marital estate that should be paid back or allocated in some fashion? If anybody had traced it, yes, and nobody did. And whose responsibility would have been to trace that? It would have been incumbent, actually, on both parties to trace that. If my client wanted a contribution back to the marital estate, it would be incumbent upon him to prove that evidence, and if she wanted to prove that it wasn't commingled with the marital estate, the burden would shift to her, and actually the burdens cancel each other out. And the case is Hagenas, H-A-G-S-H-E-N-A-S, Hagenas. Turning to the question of... So if the burdens cancel each other out, and I haven't read this case, but if the burdens cancel each other out, how does the property transmute? If the burdens cancel each other out, then it becomes a manifest weight of the evidence question, and the trial court properly found under the manifest weight that the Crawford Lane property had been transmuted into the marriage by the continued insurance and the continued payment of taxes, working on the same and improvement of the same. When Tammy inherited the property, it was worth a dollar, according to her deed. At the time of trial, it was worth $70,000. Yeah, but when you say it's worth a dollar on the deed, that's standard operating procedure. That has nothing to do with the value of the property, really. So you're saying that this case that you've cited will say that it can transmute, but it's manifest weight of the evidence. It is manifest weight of the evidence. Okay, thank you. Turning to the real quick question of dissipation of assets, statutorily it is required that notice shall be given. There was nothing that prevented notice from being given. They learned of the... He didn't find out about any of this until the last day of trial. It was actually the second to last day of trial, and there were 55 days between day three and day four, and he had the opportunity to file late. He could have asked for permission of the court to file a late notice. No notice. And, in fact, he argued against dissipation himself, citing when Tammy's trial counsel... I'm sorry. Mr. Kelly's trial counsel was trying to argue wasteful spending. No notice had been filed by either party, and the court wouldn't consider it. Is it correct that the record will reflect there still has never been a notice of intent? Yes. There's never been a notice of intent filed, and it is statutorily required by the use of the word shall. Does the panel have any further questions? No, thank you. No. All right, thank you. Thank you. You're welcome. May it please the Court. I will address the majority, which I think have been addressed by me previously, concerning the dissipation, which we acknowledge we did not file a notice. We gave our reason why we did not file a notice was. Specifically, I would point out that one of the requirements, though, is by Supreme Court rule, they're required to do supplemental disclosure. So to say that we did not follow up and do a subsequent subpoena, also, too, they have the obligation and requirement through Supreme Court rule to do supplemental disclosures, and there was not. Did you file an appropriate interrogatory as opposed to a subpoena? We filed, yes. We specifically filed an interrogatory concerning bank statements. We also did a notice of production of document stats for all bank statements, personal accounts, business accounts, any kind of financial institute. And they didn't supplement it timely? They did not. Once again, that was provided to us on the third day of trial in the morning that day. Did you ask for any kind of sanction? I did not. Part of that. And you still didn't file an intent? No, I did not. At that time, we were fairly close to near end. We acknowledged because of that situation in the late disclosure that we could address in closing. But we agreed. The court did not specifically make a finding that says I'm waiving that. But the court, as per its argument, understood that was what was there and that that was part of the notice. But I will acknowledge we did not at any time ever file a written notice of intent to claim dissipation. Specifically, as for their C, which they stood on, there was no fraud. There was no finding to specifically by the court's ruling until the trial date that the parties had cohabitated. Matter of fact, specifically, there had even been a hearing on temporary leave where they lowered substantial maintenance. It came down to $200 per month. And so we would not have had any control over the amount of time it took from the ending of the evidence until the final ruling. When was that lowering of the maintenance in terms of timing? When did that occur? That was in 2019, somewhere in 2019. And what was the basis? There was a motion to modify the temporary order? Yes, there was a motion to modify. We specifically at that point were addressing the argument about the property being foreclosured on, and they filed a motion to modify for changing circumstances, not for anything for cohabitation, but specifically for an argument that his income was lesser. And what was the basis for his reduced income at the time? The court specifically found that his income was lower at that time based upon his ability to pay. Had his employment changed? Pardon? Had his employment changed? It had not, but during that time period, some of his income, some of his overtime, and then also specifically some of the awards of the property. The court specifically, we actually had to do a motion to reconsider because there was a math mistake. We believed specifically on the maintenance, and there was a motion for clarification and to reconsider, and that was right. Well, help me understand what the property issues had to do with his temporary maintenance. As for his argument on the reason why his temporary maintenance, his argument at trial on the temporary relief was that he was paying the majority of the expenses, and so therefore he was asking for deviation for his child support, I'm sorry, from his maintenance, but also based upon that his income had been lowered at that time. But I thought that the property went into foreclosure and a number of the bills hadn't been paid. That's correct, and that was part of the thing. As to also point out specifically, he states that he did not receive notice or have knowledge. He did specifically, as through the testimony, there was a debt consolidation where listed those debts that he says he had no notice of. There were credit reports that specifically, or his credit reports when they applied for loans that list those debts. It's one of those things that was more of a convenience after the fact to say that I had no knowledge of these debts. If there's any other questions. Any final questions, Justice Gates? Just give me one moment. I'd like you to address the transmutation issue as well. This tracing of assets. Can you comment on that? Yes, by the statute, the first argument is you have to make a determination of what one of the three estates is. Is it the husband's estate, wife's estate, or the mother's estate? Specifically then by statute when you go to 503, if there's been a finding and they're trying to make a transmutation, they have to show that somehow that interest in that property has somehow become so commingled that it's lost its identity. And now that it's a situation then where it's by default transmitted to the marital estate. Now, there was money paid on the real estate taxes. There was money paid for the insurance. But all those things were maintenance. If that's the case, you'd have to have, if you were awarding any property that was non-marital, make any argument, you spend any money to maintain it, then somehow it would make it transmuted. And especially a situation where there was never any change of ownership. Most cases that usually have to do with transmutation have to do with more times than not bank accounts, investment accounts, things where you have additional money coming in, additional money coming out, and it goes into kind of the blender effect, the commingled. You didn't have that here. What you had was specifically that property all along the entire time was titled in her name and her name only. The issue of transmutation, if that is claimed by James Kelly, then is it his burden to show the mingling to the extent that it loses its identity? Yes, by statute and by case law, yes. Okay, thank you. Thank you, Justice McKinney. With regards to the debt, you agree that there were question marks listed. There were. On some of that, but I would say the argument on that is debt is just like property. There's no difference. And so there's a situation where if it is not listed specifically with the designation of non-marital or marital, that it would be considered to be marital property. And I think that debt was, there was never any testimony that a student loan was acquired before the parties were married or anything of that argument or any testimony concerning the basis why it would be non-marital. But I'm troubled by the fact that how do you allocate debt when you don't know what the debt is and when you haven't designated if the debt is marital or non-marital? I think, one, I agree you did not specifically make a finding, but there was an amount of the debt. The debt was specifically, as through the exhibits, there was what the amount of the debt was, and specifically that amount was one of the exhibits that spelled out what the balance was and when that debt occurred. But in terms of how it was placed in the order, it was in a chart. It was discussing the offsetting of the debt by the parties, and then it totaled it up. I wonder how you total something up when there's a question mark. Would you agree? I would agree. And isn't it the duty of the trial court to determine the classification of the assets and liabilities and then award the asset or liability to one or both of the parties? A hundred percent. The first thing the court should do when it comes to a division of property, you should decide, like you said, the first question is what one of these three estates does it go to? And then I agree the next thing is you have to know the values to get your jurisdiction proportions. So what does a court like us do with this? On that specific issue? Yes. If there's a question specifically, I think the only way you could really probably address it would be a remand on that issue. If there is the concern that there was specifically no designation, I think the fact that there is no designation would go to the presumption that it was marital. But if specifically through the order there's no debt, but once again there was testimony of that, and there's also the exhibit that shows the debt, if the court has that concern, it thinks that it was not. But that's not part of the court's order. I understand. I mean, you might have exhibits in the trial court and all of that testimony, but it's not in the court's order. So when you come to us as the appellate court, you have to help us find a resolution. So what is the resolution on this issue? I would think the resolution is understand that the court didn't make that specific finding, but in the proposed property proportion in the exhibits, it lists that debt allocated to her and it lists the amount. But I agree, the court did not specifically put that amount in for the debt. So you think remand would be the best way to handle that? I think the debt should be assigned to her, which is what it was. But if the court has a concern about that and believes it needs to be addressed, that remand would seem to be the proper method. But if we remand, does that open the whole judgment up? It's kind of the slippery slope we start down. Okay. Thank you. All right. Thank you, counsel. We will take this matter. We have cross-appeal. It's okay. Well, that's right. Yeah, cross-appeal. It's okay. I wish to alert the court that I misstated something. It is page 512 where Mr. Yockey testifies that Tammy started living with him in April or May of 2019. I apologize for my error of the year. And I wish to answer, then, the court's question on what the total amount is. What the totals of the debts were. The total debt at the time of the mortgage was $80,700. When you say the time of the mortgage? I'm sorry, the time of the dissolution of marriage. At the time of the trial, it was $80,700. I would ask that this court enter an order or remand for entry of an order that assigns my client to repayment of one-third, however they want to divide it, after it clarifies what debts are inside the marital estate and what debts are outside of the marital estate. I think all of the question mark debts are marital debt, meaning division. Why one-third? Because, again, the debts were created largely under the control of Tammy. For example, the 401k money was put into her checking account, her alone. She controlled it. She's the one who spent it. She's the one who put it to whoever she wanted. Whose 401k was it? My client's. Right. And he was well aware that the money was being transferred into the account. Actually, she took the $50,000 401k loan without his working with her to do it. So you're saying he had no knowledge. She was able to sign the documents without him even knowing. Yes, there was testimony that she had signed documents with his name, using his name throughout their marriage. Checks, his paychecks for deposits and things of that nature. My question was, did he have an understanding that she was making this loan? Not. The original one that was immediately paid back, yes. Not well for the $50,000 and not at all for the $8,700 or $8,900, for the smallest of the three. Okay. So he did know on the $50,000. He knew very specifically for the $50,000. They were trying to buy his property. It was well before the divorce was filed. He knew to a degree on the second one but didn't know the amount and didn't know how she was spending it. And to the last one, the one that's right under $9,000 when it was originally taken out, he had no knowledge of it whatsoever. But on the second one, I have trouble with you taking this head in the sand approach. My client is financially unsophisticated, and I can only argue as to how he was at trial and was not as trial counsel. I do believe that he was financially unsophisticated and bamboozled by what happened with all the finances from Tammy. But to follow up, though, no notice of intent participation was filed by your client either. Correct. Correct. So this idea in the loan was learned about in the VA as a trial, obviously. Correct. It was learned about, yes, in advance of trial. And no notice or intent to participate. Correct. All right. So I have questions about the valuation date of the 401K. Yes. Counsel has indicated that the valuation date was too soon. What is your position on that? My position is that Tammy invited the error of the valuation date. So let me stop you there. You believe that the date is an error? No. I believe the date is perfectly within the trial court's discretion under 503F, where the trial court has quite unlimited discretion, and that if she wanted a different date, she needed to introduce the evidence of a different value. And at the very end of trial on day four of September of 2020, she invited the error by asking to remain married. 401K has changed their value. But you agree, though, that statements are given periodically, and when you're having a trial, you introduce a statement. But you can certainly ask for gains and losses to be attributed to the parties from the date of the statement up until the date of dissolution, correct? Correct. And the trial court actually did have a mechanism for that, that if it had changed by more than 10%, then it was to increase or decrease prorata based on the percentages. So how did the trial court come up with the June date? I would make an assumption that I know there's a, it's in the evidence. It's one of the exhibits that was in there. There was a day or two of trial concerning maintenance, and I believe possibly at issue was the 40 acres from June or July of 2019, and I believe that's where its genesis came from. How does 401K, if it's not being discussed in relationship to what you just described, how do those correlate? At one point in time, TAMI's counsel filed a petition asking for my client to take an additional 401K loan out to save the 40 acres that was lost to foreclosure that ultimately her boyfriend bought later on, and it was nearly contemporaneous with the motion to reduce the temporary maintenance, which was heard over a day or two period in the summer of 2019. So was money taken for the foreclosure? No. No. The trial court actually found it was improvidently purchased and refused to allow or refused to force my client to take out an additional loan or to allow Ms. Kelly to use her personal injury settlement to save the property. So it seems like the June 2019 date was kind of plucked from the air. It could have been. I do know it is one of the exhibits that was introduced during trial. Okay. Thank you. Thank you. Does anybody else have any questions? Thank you. Okay.  All right. Thank you, counsel. We will take this matter into revision and issue a ruling in due course. Thank you.